**PHARMACIA & UPJOHN COMPANY, Plaintiff,**

v.

**MYLAN PHARMACEUTICALS, INC., Defendant.**

**No. CIV. A. 1:97–CV–41.**

United States District Court, N.D. West Virginia, Martinsburg Division.

March 31, 1998.

---

Harry M. Ruvenstein, Gerald Sobel, Steven J. Glassman, Morgantown, WV, Raymond G. Arner, William G. Jameson, Anthony B. Portuese, Kalamazoo, MI, for Plaintiff.

Lucien G. Lewin, Martinsburg, WV, E. Anthony Figg, Minaksi Bhatt, Bart G. Newland, Washington, DC, Roger L. Foster, Morgantown, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

BROADWATER, District Judge.

### I. INTRODUCTION

This is a patent infringement action in which plaintiff, Pharmacia & Upjohn Company (Upjohn), alleges that defendant, Mylan Pharmaceuticals Inc. (Mylan), has infringed Upjohn's United States patent 4,916,163 (the '163 patent) relating to certain pharmaceutical formulations of the anti-diabetic drug, glyburide. The action arises in part out of the Drug Price Competition and Patent Term Restoration Act of 1984, P.L. 98–417, 21 U.S.C. § 355(j) and 35 U.S.C. § 271(e) (commonly referred to as the "Waxman–Hatch Act"). Upjohn alleges that Mylan's filing of an Abbreviated New Drug Application (ANDA) with the Food and Drug Administration (FDA) constitutes infringement under 35 U.S.C. § 271(e)(2)(A). Upjohn also alleges that Mylan's commercial manufacture and sale of two of the accused products constituted infringement under 35 U.S.C. § 271(a).

Upjohn acknowledges that Mylan has not literally infringed the '163 patent and bases its allegations of infringement on the doctrine of equivalents. Mylan has moved for summary judgment of non-infringement as a matter of law (Document # 19) based on principles of prosecution history estoppel. The court initially heard oral argument on July 24, 1997, as to aspects of the motion for summary judgment as it was related to the defendant's motion for sanctions (Document # 11). Counsel also presented additional argument and responded to questions from the Court in reference to the motion for summary judgment during an interim status conference held on January 8, 1998. Both parties subsequently briefed the issues presented by oral argument. Mylan's motion for summary judgment is now ready for a decision.

Having considered the parties' written and oral submissions, the Court grants Mylan's motion for summary judgment for reasons set forth below.

### II. FACTUAL BACKGROUND

The following undisputed facts are taken from the parties' briefs, evidentiary submissions, and counsel's oral arguments.

### A. The Parties

Mylan is a corporation organized and existing under the laws of the State of West Virginia and has its principal place of busi-

ness at 781 Chestnut Ridge Road, Morgantown, West Virginia. Mylan is engaged in the research, development, manufacturing, and distribution of generic pharmaceutical products.

Upjohn is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 7000 Portage Road, Kalamazoo, Michigan 49001. Upjohn is a research-based pharmaceutical company and is the owner of the '163 patent.

## B. The '163 Patent ·and· its Prosecution History

The '163 patent, entitled "Spray–Dried Lactose Formulation of Micronized Glyburide," claims micronized glyburide compositions which employ a special form of lactose, known as "spray-dried lactose," as the predominant excipient. Glyburide is a drug used in the treatment of diabetes. Micronized glyburide is a finely divided form of the drug. Pharmaceutical compositions containing micronized glyburide in combination with various pharmaceutically acceptable excipients were known before the alleged invention of Upjohn's '163 patent.

The claims of the '163 patent are in the style referred to as the Jepson format. The preamble of a Jepson claim recites the subject matter that was known at the time of the alleged invention, and the body of the claim, following the transitional phrase, "the improvement which comprises," sets forth the claimed novel improvement. *See Sjolund v. Musland,* 847 F.2d 1573 (Fed.Cir.1988). Claim 1, the broadest claim of the '163 patent, reads as follows:

1. In an [sic] micronized glyburide antidiabetic pharmaceutical composition as a unit dose, containing one or more pharmaceutically acceptable excipients, the improvement which comprises: spray-dried lactose as the predominant excipient in said composition, being present therein at about not less that [sic] seventy percent (70%) by weight of the final composition.

1. Documents in the prosecution history of the '163 patent will be identified by the paper

· During prosecution of the application leading to the '163 patent, Upjohn continuously emphasized the criticality of the spray-dried lactose to the patentability of the claimed compositions. The Patent and Trademark Office (PTO) initially rejected the claims on the grounds that the prior art taught formulations of anti-diabetic drugs, including glyburide, with lactose and that it was obvious to substitute spray-dried lactose, a well-known pharmaceutical excipient, for non-spray-dried lactose. Pros. Hist., Paper No. 6 at 2.[1] Upjohn's representative responded to this rejection, arguing that,

the use of spray-dried lactose is a critical feature of the present invention. Using lactose which is not spray-dried does not yield a formulation which is easily and readily manufacturable.

Pros. Hist., Paper No. 7 at 1. To support this argument, Upjohn submitted declarations of named inventor Phillip F. Ni, Ph.D., as evidence of claimed unexpected manufacturing advantages of compositions containing spray-dried lactose as ·the predominant excipient. Dr. Ni stated that,

.[t]he key feature of the present invention is the particular type of lactose employed in the composition. The claims and the specification clearly indicate the need for spray-dried lactose. If ordinary or non-spray-dried lactose is employed in place of the spray-dried lactose, then the advantages of the present invention are lost.

Pros. Hist., Paper No. 8, ¶ 8.

The patent examiner was unpersuaded by Upjohn's arguments, but the PTO Board of Patent Appeals and Interferences (Board) reversed. In reversing the examiner's rejection, the Board stated,

[a]ppellant does not dispute that the references relied upon by the examiner establish that it would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was made to form a unit dose of micronized glyburide antidiabetic pharmaceutical using spray-dried ·lactose as a predominate excipient in an amount of about not less than about 70%

number that was assigned to them by the PTO.

by weight of the final composition. Rather, appellant argues that using spray-dried lactose instead of nonspray-dried lactose in this manner results in a product which is more easily manufactured due to the free flowing characteristics of the composition to be formed into a unit dose. Appellant relies upon his two declarations filed under 37 C.F.R. § 1.132 in support of this assertion.

Pros. Hist., Paper No. 21 at 2.

The Board reversed the examiner's rejection because,

the examiner has not introduced any evidence into the record which establishes the knowledge one of ordinary skill in the art had at the time this invention was made in regard to the properties spray-dried lactose exhibits when used in preparing pharmaceutical tablets vis-a-vis the use of nonspray-dried lactose.

Pros. Hist., Paper No. 21 at 3.

### C. Mylan's Micronized Glyburide Formulations

On August 30, 1996, Mylan sent to Upjohn a "Notice of Paragraph IV Certification" (Notification Letter) pursuant to 21 U.S.C. § 355(j)(2)(B)(ii). In the Notification Letter, Mylan stated that it had submitted an ANDA to the FDA seeking approval to manufacture, use, and sell 1.5 mg and 3.0 mg micronized glyburide tablets prior to expiration of the '163 patent. Mylan further stated that its 1.5 mg and 3.0 mg micronized glyburide tablets would not infringe the '163 patent and explained the bases for that opinion. On December 31, 1996, Mylan notified Upjohn that it had filed a supplement to its ANDA (Supplemental Notification Letter) seeking approval to market 6.0 mg micronized glyburide tablets. Mylan informed Upjohn that its 6.0 mg micronized glyburide tablets were identical in composition in all respects to its 1.5 mg and 3.0 mg micronized glyburide tablets differing only in dosage strength and that their commercial manufacture, use, and sale would not infringe the '163 patent for

the same reasons set forth in its original Notification Letter.[2]

Mylan's micronized glyburide formulations contain nonspray-dried lactose, in the form of anhydrous lactose, as the predominant excipient, and do not contain any spray-dried lactose. Spray-dried lactose is a special form of hydrous lactose.

The application leading to the '163 patent was filed on June 4, 1985. Well before that date, both the spray-dried lactose referred to in the '163 patent claims and the anhydrous lactose employed in the Mylan formulations were known pharmaceutical excipients. All claims Upjohn presented for examination by the PTO contained express limitations requiring the use of spray-dried lactose.

### D. The Mova case.

During the course of the litigation in this case, the parties informed the Court of Upjohn's similar litigation pending in the U.S. District Court for the District of Puerto Rico. Styled as *Pharmacia & Upjohn Company v. Mova Pharmaceuticals Corp.*, Civil Action No. 95–1378 (D.P.R.), this action also involved the unenforceability of the '163 patent. The formulation Upjohn manufactures contains not less than 70% spray-dried lactose by weight. The Mova formulation contains 49% spray-dried lactose by weight.

After a two and one-half week trial, the jury in *Mova* returned an adverse verdict against Upjohn on December 2, 1997. First, the jury found that Upjohn did not prove that Mova infringed the '163 patent under the doctrine of equivalents. Second, the jury found that Mova proved by clear and convincing evidence that the '163 patent was invalid because the claimed invention would have been obvious to one of ordinary skills in the art at the time it was made.

This jury verdict and its legal ramifications were fully discussed on the record at the January 8, 1998 hearing before this Court. Upjohn has filed in the District of Puerto Rico a motion for judgment as a matter of law or for a new trial. However, Mylan has

---

2. Upjohn brought this action within forty-five days of receipt of Mylan's Supplemental Notification Letter, thereby effecting a delay of FDA approval of Mylan's 6.0 mg product pursuant to 21 U.S.C. § 355(j)(5)(B)(iii).

subsequently added this as a second basis for summary judgment (Document # 39). As well, Upjohn has also responded to this motion of Mylan's.

## III. CONCLUSIONS OF LAW

### A. Summary Judgment

The Supreme Court has encouraged the use of summary judgment to resolve disputes and to simplify issues before trial.

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1) (citation omitted).

The Court of Appeals for the Federal Circuit has similarly recognized the benefits of summary judgment in patent cases.

> Summary judgment is as appropriate in a patent case as in any other. Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed.R.Civ.P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources.

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984). *See also Wang Lab. v. Mitsubishi Electronics America, Inc.,* 103 F.3d 1571 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 69, 139 L.Ed.2d 30 (1997) (prosecution history estoppel precluded finding of infringement); *Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285 (Fed.Cir.1995), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996) (patentee was estopped by prosecution history and defendant's method did not infringe patent).

A factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, when the moving party makes a *prima facie* case,

a nonmovant must do more than merely raise some doubt as to the existence of a fact; evidence must be forthcoming from the nonmovant which would be sufficient to require submission to the jury of the dispute over the fact.

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988).

### B. Prosecution History Estoppel

Upjohn acknowledges that Mylan has not literally infringed any claim of the '163 patent. Instead, Upjohn's infringement charge is based on the doctrine of equivalents. Mylan contends that Upjohn is barred by principles of prosecution history estoppel from asserting a scope of protection of the '163 patent claims that would encompass Mylan's products.

■ Prosecution history estoppel is a legal question for the court. *Insituform Techs. v. Cat Contracting,* 99 F.3d 1098, 1107 (Fed.Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1555, 137 L.Ed.2d 703 (1997). *See also Wang,* 103 F.3d at 1577. "The essence of prosecution history estoppel is that a patentee should not be able to obtain, through litigation, coverage of subject matter relinquished during prosecution." *Haynes Int'l v. Jessop Steel Co.,* 8 F.3d 1573, 1577 (Fed. Cir.1993). "The legal standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent." *Hoganas AB v. Dresser Indus.,* 9 F.3d 948, 951–52 (Fed.Cir. 1993).

■ During the patent process, Upjohn emphasized the "criticality" of using spray-dried lactose as the predominant excipient. Upjohn relied on this limitation to secure issuance of its patent and persuaded the Board that the advantages of the invention would be lost if nonspray-dried lactose were used. A reasonable competitor could have concluded that Upjohn had relinquished any interpretation of its claim that would cover glyburide compositions containing nonspray-dried lactose instead of spray-dried lactose.

The assertions that Upjohn made during prosecution bar its reliance on the doctrine of equivalents in this case. *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1174 (Fed.Cir.1993) ("Unmistakable assertions made by the applicant to the Patent and Trademark Office (PTO) in support of patentability, whether or not required to secure allowance of the claim, also may operate to preclude the patentee from asserting equivalency between a limitation of the claim and a substituted structure or process step.")

Upjohn argues that the prior art did not require that it restrict its claims to spray-dried lactose. Upjohn contends that the prior art upon which the patent examiner relied disclosed the use of what Upjohn calls "conventional" or "ordinary" lactose and that those are the only forms of lactose that were disclaimed during prosecution. However, the Court concludes that Upjohn is estopped by the assertions that it made during patent prosecution, regardless of whether those assertions were required to distinguish the prior art. Upjohn emphasized that the use of spray-dried lactose was a critical feature of its invention and clearly represented to the PTO that, "using **lactose which is not spray-dried** does not yield a formulation which is easily and readily manufacturable." Pros. Hist., Paper No. 7 at 1 (emphasis added). Dr. Ni similarly asserted on the '163 patent that the advantages of the claimed invention would be lost if "nonspray-dried" lactose were used in place of the spray-dried lactose specified in the claims. Pros. Hist., Paper No. 8 at 2.

These unambiguous statements limit Upjohn's ability to rely on the doctrine of equivalents, whether or not Upjohn had to disclaim all forms of nonspray-dried lactose to distinguish the cited prior art. *Haynes,* 8 F.3d at 1579 ("[T]he prior art and prosecution history estoppel are separate and distinct limitations on the doctrine of equivalents... [T]he limits imposed by prosecution history estoppel can be, and frequently are, broader than those imposed by the prior art."); *Southwall Technologies v. Cardinal IG Co.,* 54 F.3d 1570, 1581 (Fed.Cir.1995) ("[W]e previously rejected the ... argument

that ... prosecution history estoppel is limited only to embodiments shown in the prior art." (citation omitted)). A reasonable competitor could have concluded that Upjohn disclaimed nonspray-dried lactose in order to obtain issuance of the '163 patent. The anhydrous lactose used in the Mylan formulations is a "nonspray-dried" form of lactose.

■ "Clear assertions made during prosecution in support of patentability, **whether or not actually required** to secure allowance of the claim, may also create an estoppel." *Southwall Technologies,* 54 F.3d at 1583 (emphasis added). *See also Texas Instruments,* 988 F.2d at 1174. Thus, Upjohn's argument that its representatives disclaimed more than was necessary to overcome the examiner's rejection is also unavailing.

Upjohn advances an alternative argument that, since it did not amend its claims during prosecution, it cannot be estopped by the positions that it advocated to the PTO. Recognizing that this argument conflicts with a consistent line of precedent of the Court of Appeals for the Federal Circuit, Upjohn contends that the Supreme Court implicitly overruled this precedent in *Warner–Jenkinson Co. Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

The Federal Circuit has explained the scope of prosecution history estoppel:

Haynes' final argument is that there is no estoppel because Cabot never amended original claim 5 during prosecution. We reject this argument because it exalts form over substance. It also conflicts with our precedent, which has consistently recognized a broad range of activities which can give rise to prosecution history estoppel. There is of course the classic example of prosecution history estoppel—an amendment in response to a prior art rejection. *See* 4 Chisum § 18.05[2], at 18–157—18–158 (1992). But our precedent encompasses other conduct as, well: ... arguments submitted to obtain the patent.[8] [Citing *Townsend Eng'g Co. v. Hitec Co.,* 829 F.2d 1086, 1090 (Fed.Cir.1987)]. Thus, an estoppel can be created even when the claim, which is the basis for assertion of infringe-

ment under the doctrine of equivalents, was not amended during prosecution. *Haynes,* 8 F.3d at 1579. *See also Texas Instruments,* 988 F.2d at 1174; *Southwall Technologies,* 54 F.3d at 1583.

In support of its argument that the Supreme Court overruled this line of precedent, Upjohn relies on the following language from that Court's opinion:

> Our prior cases have consistently applied prosecution history estoppel only where claims have been amended for a limited set of reasons, and we see no substantial cause for requiring a more rigid rule invoking an estoppel regardless of the reasons for a change (citation omitted).

*Warner–Jenkinson,* 117 S.Ct. at 1050.

The Court concludes that this language does not reflect an intention by the Supreme Court to overrule longstanding precedent. The Supreme Court was addressing a different issue than that advocated by Upjohn. In *Warner–Jenkinson,* the patentee had amended its claims, and the issue before the Supreme Court was whether those amendments had been made for purposes of patentability or for other purposes, such as to clarify the language of the claim. The Supreme Court held that if the amendments were made to establish patentability, then they would create an estoppel, but if they were made for reasons unrelated to patentability, they would not create an estoppel. The case was remanded to the Federal Circuit for a determination of the reasons for the amendments. The Supreme Court did not address the question of whether arguments, as opposed to amendments, would create an estoppel. Therefore, there is no reason to conclude that the Supreme Court intended to overrule precedential decisions that were not discussed or identified and that were unrelated to the issue before it.

To the extent that such an unintended result can be gleaned from a literal application of the Supreme Court's language, it would be dictum having no precedential value. *Cohens v. Virginia,* 6 Wheat. 264, 19 U.S. 264, 5 L.Ed. 257 (1821). *See also Colby v. J.C. Penney Co., Inc.* 811 F.2d 1119, 1123 (7th Cir.1987) ("A court must give considerable weight to [its own previous] decisions unless and until they have been overruled or undermined by the decision of a higher court, or other supervening developments, such as a statutory overruling."); *Levine v. Heffernan,* 864 F.2d 457, 461 (7th Cir.1988) ("Lower courts, however, out of respect for the great doctrine of stare decisis, are ordinarily reluctant to conclude that a higher court precedent has been overruled by implication.").

Upjohn has cited no case or authority suggesting that the Supreme Court implicitly overruled the Federal Circuit's precedent on this point. In a decision rendered by the U.S. District Court for the District of Colorado after the *Warner–Jenkinson* decision, Upjohn's interpretation of the Supreme Court's opinion was not followed. *Baxa Corp. v. McGaw Inc.,* 981 F.Supp. 1348, 44 U.S.P.Q.2d 1801 (D.Colo.1997). The *Baxa* court stated that,

> [p]rosecution history estoppel applies both 'to claim amendments made to overcome prior art and to arguments submitted to obtain the patent.' *Hughes Aircraft v. United States,* 717 F.2d 1351, 1362 (Fed. Cir.1983). For an argument made to the PTO to estop the patentee, it is not necessary that the argument was the only one made by the patentee or that it was relied upon by the examiner in allowing the claims. *Southwall Technologies,* 54 F.3d at 1581–83.

981 F.Supp. 1348, 44 U.S.P.Q.2d at 1811. The *Baxa* Court was clearly aware of the Supreme Court's decision as it cited it for the proposition that the doctrine of equivalents is applied to individual elements of the claim, not to the invention as a whole. *Id.*

Similarly, the Federal Circuit's opinion in the remand of the *Warner–Jenkinson* case contains language indicating that it does not construe the Supreme Court's decision as overruling its precedential holdings that arguments as well as amendments can create an estoppel. In discussing the Supreme Court's holding that, in the absence of statements to the contrary, there should be a presumption that an amendment was made for purposes of patentability, the Federal Circuit stated,

[b]ecause of this presumption, we expect that the PTO and applicants will henceforth usually include in the prosecution history express statements of their reasons for requiring or making claim changes **or interpretive assertions.**

*Hilton Davis Chem. Co. v. Warner–Jenkinson Co., Inc.* 114 F.3d 1161, 1163 (Fed.Cir. 1997) (emphasis added). There would be no reason for the court to encourage the PTO and patent applicants to provide reasons for making interpretive assertions unless those assertions could give rise to an estoppel.

■ Upjohn also submits the affidavit of Nicholas G. Lordi, who has a Ph.D. in Pharmaceutical Chemistry, in support of its contention that there are material facts in dispute. These facts relate to whether or not the anhydrous lactose used in Mylan's formulations is in fact equivalent to the spray-dried lactose required by the patent claims. By the Court concluding that Upjohn is estopped, as a matter of law, from asserting a scope of protection under the doctrine of equivalents that would encompass Mylan's products, the disputed facts that Upjohn emphasizes are not material to Mylan's motion for summary judgment. Upjohn does not dispute the only facts that are material to this motion, namely, the composition of Mylan's product and the content of the prosecution history of Upjohn's '163 patent. By asserting its patent against Mylan, Upjohn attempts to recapture subject matter which it gave up during prosecution to secure issuance of its patent. Recapturing subject matter surrendered during prosecution is what prosecution history estoppel is designed to prevent. *Insituform Techs.,* 99 F.3d at 1107.

In circumstances such as those presented here, the Court of Appeals for the Federal Circuit has found that the application of the doctrine of equivalents may be restricted as a matter of law without further fact finding. *Sage Products v. Devon Indus.,* 126 F.3d 1420 (Fed.Cir.1997). In *Sage,* the Federal Circuit concluded that,

[i]f Sage desired broad patent protection for any container that performed a function similar to its claimed container, it could have sought claims with fewer structural encumbrances. Had Sage done so,

then the Patent and Trademark Office (PTO) could have fulfilled its statutory role in helping to ensure that exclusive rights issue only to those who have, in fact, contributed something new, useful, and unobvious. Instead, Sage left the PTO with manifestly limited claims that it now seeks to expand through the doctrine of equivalents. However, as between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure. Cf. *Maxwell v. J. Baker Inc.,* 86 F.3d 1098, 1108, 39 U.S.P.Q.2d 1001, 1007 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1244, 137 L.Ed.2d 327 (1997) (discussing danger of allowing patentee to file and prosecute narrow claims and then, during the course of litigation, expand its exclusive rights under the doctrine of equivalents, thereby avoiding examination of the broad subject matter).

*Sage,* 126 F.3d at 1425. *See also Kress Corp. v. Alexander Servs., Inc.,* 991 F.Supp. 740, 44 U.S.P.Q.2d 1933, 1938 (W.D.Pa.1997).

As in *Sage,* Upjohn had the opportunity to present claims to the PTO in which the lactose excipient was defined as Upjohn now advocates, *i.e.,* by its particle size, compressibility and flow characteristics. In view of the difficulties that Upjohn encountered during prosecution of narrower claims, Upjohn's choice to limit the claims is understandable. Upjohn's decision to limit its claims specifically to spray-dried lactose is a choice upon which the public was entitled to rely. Accordingly, the consequences of this choice should fall on Upjohn.

**C. Invalidity and unenforceability of the '163 patent**

On December 2, 1997, the jury in *Mova* returned a verdict for Mova finding that the '163 patent was invalid, unenforceable, and was not infringed by Mova. The *Mova* court entered judgment on December 2, 1997. On December 17, 1997, Upjohn filed a motion for judgment as a matter of law or for a new trial. Upjohn filed its brief in support of the motion on February 23, 1998.

In *Blonder–Tongue Labs. Inc. v. University of Illinois Found. et al.*, 402 U.S. 313, 330–34, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Supreme Court held that a judgment of invalidity in a suit against one infringer accrues to the benefit of any other accused infringer unless the patent owner shows that the owner did not "have a fair opportunity procedurally, substantively and evidentially to pursue [the patent] claim the first time." (citing *Eisel v. Columbia Packing Co.*, 181 F.Supp. 298, 301 (Mass.1960)).

 The estoppel doctrine of *Blonder–Tongue* applies even when the earlier decision is on appeal. *Iron Ore Co. of Canada v. The Dow Chemical Co., et al.*, 177 U.S.P.Q. 34, 1972 WL 19314 (D.Utah 1972). The *Iron Ore* court held that "until earlier decisions are reversed or modified, they comprise the law applicable to the validity and scope, if any, of the plaintiff's rights under the patent as litigated in that case." *Id.* at 59.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Mylan's motion for summary judgment should be granted. As to the issue of non-infringement, the Court concludes that the commercial manufacture, use, and sale of Mylan's micronized glyburide products do not infringe on the '163 patent, since these products do not contain spray-dried lactose as required by the '163 patent claims. As to the issue of invalidity, the Court concludes that the *Mova* verdict makes the '163 patent unenforceable.

The Court, therefore, **ORDERS**

1. That the Defendant Mylan's motion for summary judgment (Document # 19) is **GRANTED**.

2. That judgment in favor of the defendant Mylan for non-infringement and invalidity of plaintiff Upjohn's U.S. patent 4,916,163 is **GRANTED**.

3. That, there remaining nothing further to consider, this matter be **DISMISSED** and stricken from the Court's active docket.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.