**UPJOHN COMPANY, Plaintiff,**

v.

**MOVA PHARMACEUTICAL CORP., Defendant.**

No. 95–1378 (PG).

United States District Court, D. Puerto Rico.

Aug. 17, 1998.

As Amended Aug. 25, 1998.

---

Gerald Sobel, Kaye, Scholer, Fierman, Hays & Handler, New York, NY, Marta Qui-

nones–Zambrana, Cancio, Nadal, Rivera & Diaz, San Juan, PR, for Plaintiff.

Allen R. Baum, Matthew P. Blischak, Burns, Doane, Swecker & Mathis, LLP, Alexandria, VA, David C. Indiano–Vicic, Indiano, Williams & Weinstein–Bacal, San Juan, PR, for Defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

Plaintiff Upjohn Company ("Upjohn") brought this patent infringement action against MOVA Pharmaceutical Corp. ("MOVA") alleging that MOVA infringed Upjohn's United States Patent No. 4,916,163 ("the '163 patent") on a drug used to treat diabetes. A jury trial lasting nearly a month was conducted during November, 1998 and the jury returned a verdict for MOVA on all causes of action, including MOVA's counterclaim, on December 2, 1997. Before the Court is Upjohn's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial.

There were four separate matters before the jury: (1) infringement; (2) willful infringement; (3) unenforceability and (4) invalidity. Upjohn bore the burden of proof on the first two causes of action while MOVA carried this burden on the latter. At the close of evidence, Upjohn moved for judgment as a matter of law. The Court denied Upjohn's motion. Upjohn now renews its motion for judgment as a matter of law and, in the alternative, asks for a new trial. For all the reasons set forth below, Upjohn's motion is denied.

### I. Standard of Review

Upjohn seeks to have the jury verdict set aside on all four causes of action. The standard for review of such jury verdicts is clear. The record must be viewed in the light most favorable to the jury's verdict under Fed.R.Civ.P. 50. *Alvarez–Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.,* 152 F.3d 17, 23 (1st Cir.1998); *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1188 (1st Cir. 1995), *cert. denied sub nom. Hospital San Francisco, Inc. v. Gonzalez,* 517 U.S. 1136, 116 S.Ct. 1423, 134 L.Ed.2d 547 (1996). The facts must be considered as the jury might have found them, resolving all reasonable inferences in favor of the non-moving party. *Ansin v. River Oaks Furniture,* Inc. 105 F.3d 745, 749 (1st Cir.1997), *cert. denied, —— U.S. ——,* 118 S.Ct. 70, 139 L.Ed.2d 31 (1997). The court may not consider the credibility of the witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence. *See, Katz v. City Metal Co.,* 87 F.3d 26, 28 (1st Cir.1996); *Sanchez v. Puerto Rico Oil Company,* 37 F.3d 712, 716 (1st Cir.1994). Though we are bound by First Circuit precedence with respect to this procedural standard, we note that the Federal Circuit, which binds this Court on substantive issues in patent litigation, concurs fully. *E.g. Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1514 (Fed.Cir.1984), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).

### II. Background and Procedural History

This suit arises out of an Abbreviated New Drug Application ("ANDA") MOVA filed with the FDA seeking to manufacture and market a generic version of Upjohn's drug. Among other things, the ANDA requires a showing that the new drug is bioequivalent to a previously approved, listed drug. The ANDA also requires a certification that, in pertinent part, the patent claiming the listed drug "is invalid or will not be infringed by the manufacture, use, or sale of the new drug ...." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). An applicant who makes a certification pursuant to paragraph IV must give notice of the application to the owner of each patent in the certification, together with documents supporting the applicant's position. 21 U.S.C. § 355(j)(2)(B)(I)-(ii). Accordingly, on February 7, 1994, MOVA notified Upjohn of its ANDA. Upjohn, in turn, filed this lawsuit seeking declaratory judgment, injunction, and damages. On January 9, 1997, this Court granted MOVA's Motion for Summary Judgment in part holding that MOVA's formulations do not literally infringe the '163 patent. The Court denied MOVA's motion holding that there was no infringement under the doctrine of equivalents.

## A. The Patent

The formulation Upjohn's patent claims contains two principal elements: micronized glyburide, which is the active ingredient, and spray-dried lactose, which is an excipient,[1] the latter being present in amounts of at least about 70% by weight. It also could include other excipients. At trial, Upjohn only asserted infringement of claims 1 and 3 of its patent:

1. In a micronized glyburide anti-diabetic pharmaceutical composition as a unit dose, containing one or more pharmaceutically acceptable excipients, the improvement which comprises:

spray-dried lactose as the preponderant excipient in said composition, being present therein at about not less [than] seventy percent (70%) by weight of the final composition.

3. The improvement according to claim 1 wherein the excipients comprise a glidant, lubricant and disintegrant.

■ The invention Upjohn patented falls into the category of so-called "secondary" inventions, as opposed to "pioneer" inventions. As the term suggests, secondary inventions include combinations of old elements that produce new and useful results, as is the case with Upjohn's composition here. *See, Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

## B. MOVA's ANDA Formulations

The MOVA formulations also contain micronized glyburide as the active ingredient, with 49% by weight spray-dried lactose and 46.3–49.1% Starch 1500, another excipient.

## III. Discussion

### A. There Was Sufficient Evidence for the Jury to Find That There Is No Infringement Under the Doctrine of Equivalents

■ Upjohn had the burden at trial to prove by a preponderance of the evidence that there was infringement under the doctrine of equivalents. The classic test for infringement under the doctrine of equivalents is the function-way-result test which requires the finder of fact to consider whether an accused device performs a substantially different function in a substantially different way to obtain a substantially different result. *See, Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. at 608, 70 S.Ct. 854. "An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way and result of the claimed element." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997). The test for infringement under the doctrine of equivalents has also been described as the "insubstantial differences" test which concerns the substantiality or insubstantiality of the differences between the elements of an accused and patented device. *Id.* "An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Graver Tank*, 339 U.S. at 609, 70 S.Ct. 854.

■ There was significant evidence presented at trial on which the jury could have relied in reaching its conclusion that Upjohn had not satisfied its burden of establishing infringement under the doctrine of equivalents. There was extensive testimony from fact and expert witnesses describing in detail the differences between the claimed spray-dried lactose and the accused equivalent ingredient, Starch 1500 in which the jury could have based its verdict. Moreover, the jury could have based its verdict of non-infringement on the testimony of Upjohn's own expert witness, Dr. Kibbe, who when asked if he had "ever heard of anyone taking spray-dried lactose out of a formulation and replacing it with Starch 1500" admitted that he had "...never heard of a formulator who had a useful formulation using spray-dried lactose making that substitution." Similarly, MOVA's expert, Dr. Rodriguez, testified that " Starch 1500 and spray-dried lactose are not

1. An excipient is an inactive ingredient that allows a drug to be produced in a form patients can use.

interchangeable in a pharmaceutical formulation. They serve different functions." There was also substantial testimony from both Upjohn and MOVA witnesses that spray-dried lactose and Starch 1500 are distinctly different ingredients added to formulations for different reasons.

Upjohn's main argument for judgment as a matter of law is that MOVA failed to offer any contrary evidence regarding the equivalence of MOVA's "combination of ingredients" to the spray-dried lactose element of the '163 patent claims. MOVA argues that this is not a proper test for infringement because it is a test of infringement based on the accused device as "a whole" instead of on an element by element basis. Whether or not Upjohn's "combination of ingredients" argument is a proper test for infringement, examination of the record shows that there was substantial evidence before the jury concerning the combination of MOVA's ingredients. For example in testifying about the differences, Dr. Rodriguez testified that "you are releasing the drug by two very different delivery systems." Moreover, evidence before the jury concerning the lack of any known interchangeability between spray-dried lactose and starch 1500 is relevant to the non-equivalents of the combination with spray-dried lactose.

Upjohn also argues that there was no evidence before the jury that MOVA's formulations substantially differ in function, way or result.[2] There was substantial evidence before the jury concerning differences in the way MOVA's formulations perform the function of rapid dissolution. Dr. Rodriguez succinctly explained the differences in the way this function is performed:

> [T]he results of these two, from these two ingredients, Starch 1500 and spray-dried lactose are very different. Starch 1500 disintegrates, breaks up the tablet and releases the active ingredient and the active ingredient is dissolved. It's a two step process. Lactose dissolves and lactose has to dissolve to release the ingredient.

2. MOVA's admission of bioequivalence is not an admission of infringement under the doctrine of

This alone provided substantial evidence upon which the jury could have based its verdict of non-infringement.

Upjohn also alleged that MOVA's infringement was willful. The jury's finding with respect to non-infringement is also dispositive on the issue of willful infringement and there is no need to dwell on the ample evidence of MOVA's good faith in the record here. There was substantial evidence presented at trial that MOVA sought and obtained competent written opinions of counsel concerning noninfringement of the '163 patent.

Upjohn also argues that the instruction given by the court on the definition of the word "preponderant" was improper. The term "preponderant" was the only claim term in dispute. The construction is proper and is based on the specification and the patent prosecution history of the '163 patent. The term is defined as in the context of the '163 specification and the instruction is consistent with the way the term is used throughout the prosecution history. *See, Johns Hopkins University v. Cellpro, Inc.,* 1998 WL 466633, 152 F.3d 1342, 1348–51 (Fed.Cir.1998).

**B.** *There Was Substantial Evidence For The Jury To Find That Claims 1 and 3 of The '163 Patent Are Invalid*

It was MOVA's burden to establish invalidity by clear and convincing evidence. A patent can be held invalid for obviousness under 35 U.S.C. § 103 when the "...differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) requires consideration of (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue (3) the level of ordinary skill in the art and (4) any objective evidence of nonobviousness or secondary considerations. There was substantial evi-

equivalents. They are two distinct concepts.

dence at trial presented on each of these considerations supporting the jury's verdict of obviousness.

Undisputed evidence was presented at trial that the scope and content of the prior art included all of the claimed ingredients. It was also undisputed that the prior art included spray-dried lactose and micronized glyburide. There was also evidence presented at trial that the prior art included patents with more than 70% spray-dried lactose and micronized anti-diabetic active ingredients. There was also substantial evidence for the jury to conclude that the combination would have been obvious to one of ordinary skill in the art and that such a person would have been motivated to make such a combination and reasonably expected the combination to work. MOVA presented evidence that it would have been obvious to use spray-dried lactose in preparing a direct compression tablet of micronized glyburide because it was the direct compression excipient of choice to one of ordinary skill in the art with low dose drugs such as micronized glyburide. Prior art evidence further suggested the use of spray-dried lactose in excess of 70% in the well known process of direct compression. As evidence that such a combination would have been obvious at the time the invention was made, MOVA introduced a prior art patent issued to Simpson combining micronized anti-diabetic active ingredients with more than 70% spray-dried lactose. The use of the other ingredients recited in claim 3 was also demonstrated as conventional in the same prior art patents. The jury found that MOVA had met its burden of proving by clear and convincing evidence that the patent is invalid for obviousness.

Upjohn advances three arguments against the jury's verdict of invalidity: (1) the Rothe patents teach away from the patented invention, (2) the prior art recognized serious problems with the use of a direct compression process to make tablets containing a micronized drug and (3) the specific references MOVA relied upon for the suggestion to make the combination of a micronized drug and spray-dried lactose do not make that suggestion.

There was no dispute at trial that micronized glyburide was generally known to those of ordinary skill in the art. Regardless, there was substantial evidence before the jury suggesting the claimed combination and that the Rothe patents did not teach away from the combination. There were prior art patents teaching the combination of more than 70% spray-dried lactose and micronized anti-diabetic active ingredients. There is nothing in the Rothe patents teaching away from the claimed combination. For example, there is nothing in these patents that suggests that micronized glyburide cannot be used with spray-dried lactose. The jury could have concluded, as did MOVA's expert Dr. Rodriguez, that the claimed combination would have been obvious even if Rothe patents disclose only a wet granulation process.

Upjohn further argues that the prior art recognized serious problems with the use of a direct compression process to make tablets containing a micronized drug. There was also evidence, however, before the jury that those of ordinary skill in the art knew that spray-dried lactose could be used to address such problems. Dr. Rodriguez further testified that "there were earlier patents, the Simpson patents that suggest a combination of micronized anti-diabetic agent with the lactose and spray-dried lactose" and that in combining micronized glyburide and spray-dried lactose, one would ". . . expect it to work, expect it to be bioavailable, to have good dissolution."

Last, Upjohn argues that these prior art patents taught the use of more than 50% spray-dried lactose but did not teach the use of more than 70% spray-dried lactose. Upjohn asks the Court to invade the province of the jury. It is the jury who decides what the prior art references taught and it may accept or reject any expert testimony as to what the references taught those of ordinary skill in the art. Here, there was substantial evidence that the prior art taught more than 70% spray-dried lactose in combination with micronized glyburide.

C. *There Was Substantial Evidence For The Jury To Find That The '163 Patent Is Unenforceable*

█ It was also MOVA's burden to establish by clear and convincing evidence that the

patent is unenforceable because of inequitable conduct. Inequitable conduct requires clear and convincing threshold evidence of (1) a material omission or misrepresentation, and (2) an intent to deceive. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988). These findings are then weighed in light of all the circumstances to determine whether inequitable conduct occurred. *Refac Int'l. Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1581 (Fed.Cir. 1996).

■ There were several independent grounds upon which the jury's verdict of inequitable conduct could have been based. There was evidence presented at trial that the '163 patent would not have been obtained but for the submission of two affidavits claiming to show unexpected benefits of manufacturability by demonstrating flow in an hourglass. There was also substantial evidence presented at trial that there were serious omissions or misrepresentations made in these affidavits. Evidence showed that (1) the affidavits did not include or explain any of the failed experiments Upjohn conducted with its formulations that did not flow in the "hourglass demonstration" and (2) the first affidavit incorrectly made it appear as though micronized glyburide was used in the experiment when in actuality it was not. An internal Upjohn document authored by Dr. Ni indicated that flow problems were attributable to micronized glyburide.

There was substantial evidence of materiality. Walter Modance is a retired patent examiner with over 31 years of experience. Mr. Modance testified that "the examiner must rely exclusively on what's in the affidavit because the patent office has no testing laboratory" and the examiner does not know whether the applicant has given him all the relevant data. Mr. Modance further testified that the affidavits carried the case and the patent would not have issued without submission of the affidavits. Mr. Ni only told the PTO about the "hourglass demonstrations" supportive of patentability and did not give the examiner the tests that included spray-dried lactose and micronized glyburide that did not flow in the hourglass. The PTO was also never informed that flow problems were attributable to micronized glyburide.

Substantial evidence of intent to deceive was also before the jury. Dr. Ni was trying to demonstrate improved manufacturability. Dr. Ni did not disclose test results that did not support his demonstration of improved manufacturability. The jury could have inferred that Upjohn intended the examiner rely on the results reported in the Affidavit thereby misleading the Examiner in thinking that all relevant data was supportive of patentability when indeed it was not. The jury also could have inferred intent to mislead the PTO from Ni's use of formulations not including micronized glyburide because he knew that micronized glyburide was attributable to flow problems.

■ In balancing materiality and intent to determine whether there was inequitable conduct, the jury could have determined that materiality was very high. A false or misleading declaration submitted to the PTO is *ipso facto* material. *Rohm and Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir.1983). "The more material the omission or misrepresentation, the less intent must be shown to reach a conclusion of inequitable conduct." *Refac Int'l. Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1581 (Fed.Cir.1996).

Upjohn argues it is entitled to judgment as a matter of law because the affidavits were not material, there was cure of any misleading statements, or that there was not evidence of an intent to deceive. There was substantial evidence that the data withheld concerning no flow in an hourglass was material. Upjohn convinced the PTO that it was entitled to a patent based on the "hourglass demonstration." Even if all of the failed tests did work in manufacturing the machines, Upjohn still had a duty to disclose the unfavorable test results. Upjohn's argument that the data was directed to formulations with more glyburide than covered in the patent ignores that the claims are not limited to a specific amount of glyburide. Upjohn's arguments that it later told the PTO that there was no micronized glyburide in the experiments fail to address that there were other experiments that included micronized glyburide that failed which were never given

to the PTO. In addition to the "intent" evidence discussed above, there was other substantial evidence before the jury including a handwritten note from Dr. Ni's supervisor on the Upjohn internal invention disclosure concerning the importance of protecting Upjohn's marketing position with respect to glyburide [the active ingredient].

MOVA also presented substantial evidence on other alleged acts of inequitable conduct concerning inventorship and other issues. The Court need not further address these issues in view of the independent substantial evidence of inequitable conduct before the jury concerning the affidavits.

D. *New Trial*

Similarly, Upjohn is not entitled to a new trial. The record shows there is no verdict clearly against the demonstrable weight of the credible evidence as to result in a manifest miscarriage of justice. *See, e.g., Lama v. Borras*, 16 F.3d 473, 477 (1st Cir.1994). Upjohn's claim interpretation concern, even if valid, would not warrant a new trial because it would not have affected the other verdicts of invalidity and inequitable conduct in favor of MOVA. There are no circumstances here that would compel a new trial.

### III. Conclusion

For the foregoing reasons, Upjohn's Motion for Judgment as a Matter of Law, and in the Alternative A New Trial, is hereby **DENIED.**

**IT IS SO ORDERED.**