PHARMACIA & UPJOHN COMPANY,
Plaintiff–Appellant,

v.

MYLAN PHARMACEUTICALS,
INC., Defendant–Appellee.

No. 98–1360.

United States Court of Appeals,
Federal Circuit.

March 18, 1999.

Steven J. Glassman, Kay, Scholer, Fierman, Hays & Handler, LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were Gerald Sobel, and George A. Xixis.

E. Anthony Figg, Rothwell, Figg, Ernst & Kurz, of Washington, DC, argued for defendant-appellee. With him on the brief was Minaksi Bhatt. Of counsel were Lucien G. Lewin, Steptoe & Johnson, of Martinsburg, West Virginia; and Dawn J. Beto and Roger L. Foster, Mylan Laboratories, Inc., of Morgantown, West Virginia.

Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.

LOURIE, Circuit Judge.

Pharmacia & Upjohn Company ("Upjohn") appeals from the decision of the United States District Court for the Northern District of West Virginia granting summary judgment to Mylan Pharmaceuticals, Inc. The court held that Mylan did not infringe the claims of Upjohn's U.S. Patent 4,916,163 under the doctrine of equivalents because of prosecution history estoppel, and alternatively, that Upjohn was collaterally estopped from asserting its infringement claim by a prior judgment of invalidity and unenforceability. *See Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.,* 5 F.Supp.2d 399, 46 USPQ2d 1831 (N.D.W.Va.1998). Because the district court did not err in its conclusions, we affirm.

## BACKGROUND

### A. *The Invention*

The patent at issue involves formulations of the anti-diabetic drug glyburide that contain two key components: micronized glyburide (finely divided glyburide) and lactose. Lactose exists in both hydrous (the monohydrate) and anhydrous forms and acts as an excipient, *i.e.,* an inactive ingredient, in pharmaceutical compositions. Hydrous lactose is difficult to use in manufacturing micronized glyburide formulations because of poor compressibility and poor hopper flow. To avoid those problems, "spray-dried lactose" (a particular form of hydrous lactose) or anhydrous lactose may be utilized. Both spray-dried and anhydrous lactose are readily compressible and have considerably larger particle size than hydrous lactose, qualities which facilitate tablet manufacture.

The '163 patent is directed to micronized glyburide formulations containing spray-dried lactose as the principal excipient. Claim 1, the only independent claim, is writ-

ten in the Jepson format and reads as follows:

1. In an [sic] micronized anti-diabetic pharmaceutical composition as a unit dose, containing one or more pharmaceutically acceptable excipients, the improvement which comprises: spray-dried lactose as the preponderant excipient in said composition, being present therein at about not less that [sic] seventy percent (70%) by weight of the final composition.

'163 patent, col. 4, ll. 17–24. Claim 2 more particularly claims micronized glyburide of a specific surface area, see id. at ll. 25–27, while claims 3 and 4 more particularly claim combinations of excipients to be used with micronized glyburide, see id. at ll. 28–33.

Mylan, a generic drug manufacturer, devised several micronized glyburide compositions, all of which use anhydrous lactose as the principal excipient; they contain no spray-dried lactose. Mylan filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration seeking approval to sell 1.5 mg and 3.0 mg micronized glyburide tablets before the expiration of the '163 patent. Mylan filed a supplement to the ANDA seeking approval for a 6.0 mg tablet as well. Pursuant to 21 U.S.C. § 355(j)(2)(B)(ii), on August 30, 1996, Mylan sent Upjohn a "Notice of Paragraph IV Certification" notifying Upjohn of its submission of an ANDA for the 1.5 and 3.0 mg tablets and explaining why its tablets did not infringe the claims of the '163 patent. On December 31, 1996, Mylan sent Upjohn a similar notification letter regarding its supplemental ANDA for the 6.0 mg tablets.

B. *The District Court*

Upjohn sued Mylan in the district court alleging that Mylan's filing of the ANDA with respect to the 1.5, 3.0, and 6.0 mg compositions constituted infringement of claims 1 through 4 of the '163 patent under 35 U.S.C. § 271(e)(2). Conceding a lack of literal infringement, Upjohn alleged that Mylan's micronized glyburide compositions infringe under the doctrine of equivalents because "anhydrous lactose" is the equivalent of "spray-dried lactose." Mylan moved for summary judgment, arguing that Mylan did not infringe because of prosecution history estoppel, and alternatively, that Upjohn was collaterally estopped by the judgment of invalidity and unenforceability in *Upjohn Co. v. Mova Pharmaceutical Corp.*, 31 F.Supp.2d 211, 48 USPQ2d 1357 (D.P.R.1998).

As to infringement under the doctrine of equivalents, the district court observed that throughout the prosecution of the '163 patent, Upjohn emphasized the "criticality" of using spray-dried lactose as the principal excipient in its micronized glyburide formulations. See Mylan, 5 F.Supp.2d at 403, 46 USPQ2d at 1835. The court indicated that Upjohn relied on the spray-dried lactose limitation to obtain issuance of the claims and argued to the Board of Patent Appeals and Interferences (the "Board") that if spray-dried lactose were not used, the advantages of the invention would not be realized. See id. The court reasoned that "[a] reasonable competitor could have concluded that Upjohn had relinquished any interpretation of its claim that would cover glyburide compositions containing nonspray-dried lactose instead of spray-dried lactose." Id. The court thus held that based on assertions made during prosecution of the application, Upjohn was barred from relying on the doctrine of equivalents by prosecution history estoppel. See id. at 404, 46 USPQ2d at 1835.

As an alternative basis for summary judgment, the district court held that Upjohn was collaterally estopped by the judgment of invalidity and unenforceability in *Mova* under *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788, 169 USPQ 513 (1971). See Mylan, 5 F.Supp.2d at 407, 46 USPQ2d at 1838;[1] see also Mova, 31 F.Supp.2d 211, 48 USPQ2d at 1360–62 (denying Upjohn's motion for judgment as a matter of law (JMOL)/new trial and upholding, inter alia, the jury verdicts that 1) claims 1 and 3 of the '163 patent were invalid as

1. The district court's holding and corresponding order are somewhat inconsistent with the court's reasoning in its Memorandum Opinion and Order. We clarify both the holding and the order at the conclusion of this opinion. *See infra* note 6.

obvious and 2) the patent was unenforceable due to inequitable conduct). Upjohn appealed both the prosecution history estoppel and collateral estoppel rulings to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994).

## DISCUSSION

### A. Standards of Review

■ We review a district court's grant of summary judgment de novo. See Ethicon Endo–Surgery, Inc. v. United States Surgical Corp., 149 F.3d 1309, 1315, 47 USPQ2d 1272, 1275 (Fed.Cir.1998). Summary judgment is properly granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1307, 46 USPQ2d 1752, 1755 (Fed.Cir.1998).

■ Whether prosecution history estoppel applies to limit the doctrine of equivalents is a question of law which we review de novo. See Wang Lab., Inc. v. Mitsubishi Elecs. Am., 103 F.3d 1571, 1578, 41 USPQ2d 1263, 1269 (Fed.Cir.1997). We likewise review a district court's application of collateral estoppel de novo. See Heyliger v. State Univ. and Community College Sys. of Tenn., 126 F.3d 849, 851 (6th Cir.1997); Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 50 (1st Cir.1997).

### B. Prosecution History Estoppel

■ Upjohn argues that the court improperly considered only selected portions of the prosecution history and incorrectly concluded that Upjohn relinquished micronized glyburide formulations containing any type of lactose other than spray-dried lactose. See Read Corp. v. Portec, Inc., 970 F.2d 816, 824, 23 USPQ2d 1426, 1433 (Fed.Cir.1992) ("Every statement made by a patentee during prosecution to distinguish a prior art reference does not create a separate estoppel.

Arguments must be viewed in context."). Upjohn asserts that when viewed as a whole, the prosecution history reveals that the term "nonspray-dried" lactose was used in the prosecution history to refer to ordinary, hydrous lactose, and thus only formulations containing micronized glyburide and hydrous lactose were surrendered. See Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co., 66 F.3d 285, 291, 36 USPQ2d 1095, 1100 (Fed.Cir.1995) ("The prosecution history must be examined as a whole in determining whether estoppel applies." (quoting Wang Lab., Inc. v. Toshiba Corp., 993 F.2d 858, 867, 26 USPQ2d 1767, 1775 (Fed.Cir.1993))). Moreover, Upjohn indicates that it made no clear and unmistakable assertions surrendering formulations containing anhydrous lactose, that there were no claim amendments to this effect, and, as the two declarations by the inventor, Dr. Philip Ni, exemplify, the applicant only distinguished formulations containing hydrous lactose from formulations containing spray-dried lactose. Finally, Upjohn asserts that even if there were any ambiguity as to what was meant by "nonspray-dried lactose," this ambiguity would not create an estoppel. See Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1582, 37 USPQ2d 1365, 1373 (Fed.Cir. 1996). Mylan responds that the district court did in fact read the statements at issue in context and that it did consider the prosecution history as a whole. Mylan argues that clear and unequivocal statements in the prosecution history reveal that Upjohn relinquished micronized glyburide formulations which do not contain spray-dried lactose as the preponderant excipient.

■ We agree with Mylan that the district court properly concluded that Upjohn is barred from claiming that Mylan's formulations containing micronized glyburide and anhydrous lactose are within the scope of the '163 patent under the doctrine of equivalents. Prosecution history estoppel precludes a patentee from obtaining under the doctrine of equivalents coverage of subject matter that has been relinquished during the prosecution of its patent application. See Mitsubishi, 103 F.3d at 1577–78, 41 USPQ2d at 1269. A number of activities during pros-

ecution may give rise to prosecution history estoppel, *see Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579, 28 USPQ2d 1652, 1657 (Fed.Cir.1993), including arguments made to obtain allowance of the claims at issue, *see Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460, 46 USPQ2d 1169, 1178 (Fed.Cir.1998) (en banc); *Texas Instruments v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1174, 26 USPQ2d 1018, 1025 (Fed. Cir.1993). For an estoppel to apply, such assertions in favor of patentability must "evince a clear and unmistakable surrender of subject matter," *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1458, 46 USPQ2d 1321, 1327 (Fed.Cir.1998), not an "equivocal" one. *See Athletic Alternatives*, 73 F.3d at 1582, 37 USPQ2d at 1373.

■ To determine what subject matter has been relinquished, an objective test is applied, inquiring "whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Cybor*, 138 F.3d at 1457, 46 USPQ2d at 1175. This formulation of the en banc *Cybor* court followed numerous similar articulations of this standard. See e.g., *Mark I*, 66 F.3d at 291, 36 USPQ2d at 1100; *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 952, 28 USPQ2d 1936, 1939 (Fed.Cir.1993); *Prodyne Enters., Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581, 1583, 223 USPQ 477, 478 (Fed.Cir. 1984).[2]

In reaching its conclusion, the district court focused on two key portions of the prosecution history: the response to the first office action, which contains statements made by the attorney prosecuting the application as well as by inventor Ni, and the opinion by the Board reversing the examiner's rejection

of the claims under 35 U.S.C. § 103. In the first office action, the examiner rejected the four claims of the patent as obvious over the disclosures of certain Weber patents and Rothe patents in view of patents to Sawada and Tokumori. *See* Paper No. 6 at 2. In response, Upjohn's attorney made the following argument in attempting to gain allowance of the claims:

> As indicated in the specification, the use of spray-dried lactose is a critical feature of the present invention. Using lactose which is not spray-dried does not yield a formulation which is easily and readily manufacturable.

Paper No. 7 at 1. Based on the plain meaning of this language, we agree with the district court that these statements would reasonably be interpreted as a "clear and unmistakable surrender" of micronized glyburide compositions that do not contain spray-dried lactose. Upjohn attempts to explain away these statements by contending that one must read them in the context of the subsequent paragraph, which reads:

> *In particular*, the Examiner's attention is invited to the Ni declaration, provided with this response. As indicated by Ni, in a side-by-side comparison of a spray-dried lactose formulation with a corresponding formulation made with conventional lactose, the resulting bulk pharmaceutical powder cannot be readily processed. As indicated by Ni, additional processing of the bulk powder is required in order to achieve manufacturability.

*Id.* (emphasis added). Upjohn argues that in making this reference to the Ni declaration it was merely comparing micronized glyburide

---

**2.** We have also stated that the prosecution history should be objectively viewed from the perspective of one skilled in the art. *See, e.g., Litton*, 140 F.3d at 1462, 46 USPQ2d at 1330 ("one of ordinary skill in the art"); *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1555, 37 USPQ2d 1609, 1616 (Fed.Cir.1996) ("person of skill in the field"). *Hoganas* has suggested that such a standard is really not at odds with the reasonable competitor standard:

> Ordinarily, the test for determining the meaning of a claim term is from the vantage point of one skilled in the art. This test would seem equally appropriate for determining what subject matter was relinquished in the context of

prosecution history estoppel. Our precedent dealing with this specific question recites that the test is measured from the vantage point of a reasonable competitor. We do not see these formulations as necessarily inconsistent—*the point is the knowledge of one reasonably skilled in the art who views the question from the perspective of a competitor in the marketplace.* *Hoganas*, 9 F.3d at 952 n. 15, 28 USPQ2d at 1939 n. 15. (emphasis added) (citations omitted). It is, after all, a competitor who is desirous of ascertaining the scope of the claims, but it is one skilled in the art who is best able to understand them. Nonetheless, the standard is the reasonable competitor standard as articulated in *Cybor*.

formulations containing spray-dried lactose with those containing conventional, hydrous lactose. Thus, Upjohn continues, "lactose which is not spray-dried" in the preceding paragraph referred only to hydrous lactose, and it was only micronized glyburide formulations containing hydrous lactose that were surrendered.

We find this argument unpersuasive. Rather, we agree with Mylan that the first paragraph is reasonably interpreted as a broad disclaimer of what the invention was not (micronized glyburide formulations containing nonspray-dried lactose), followed by a specific example (hence the words "in particular") of how Upjohn's spray-dried lactose formulation was superior to a specific formulation with nonspray-dried lactose (here, hydrous lactose) in the second paragraph. Moreover, Upjohn's argument fails to address the clear and unequivocal statement in the first paragraph that spray-dried lactose was deemed to be a "critical feature" of the claimed formulations.

Statements in inventor Ni's declaration responding to the first office action closely mirror those made by Upjohn's attorney:

8. *The key feature of the present invention is the particular type of lactose employed in the composition. The claims in the specification clearly indicate the need for spray-dried lactose.* If ordinary or nonspray-dried lactose is employed in place of the spray-dried lactose, then the advantages of the present invention are lost.

Paper No. 8 at 2 (emphasis added). Again, based on a plain reading of this language, especially the emphasized portion, we agree with the district court that micronized glyburide compositions that do not contain spray-dried lactose have been surrendered. Upjohn argues that one must read Ni's statements in the context of other paragraphs in both the first and second Ni declarations, as well as pages from Ni's laboratory notebook. Upjohn asserts that these portions of the prosecution history indicate that Ni *only* compared micronized glyburide formulations containing spray-dried lactose with those containing hydrous lactose. Moreover, Upjohn asserts that the language "ordinary *or*

nonspray-dried lactose" in paragraph 8, id. (emphasis added), shows that the terms "nonspray-dried lactose" and "hydrous lactose" were in fact synonymous. Accordingly, Upjohn urges that "nonspray-dried lactose" was only meant to refer to hydrous lactose, and thus only micronized glyburide formulations containing hydrous lactose were relinquished.

We find these arguments similarly unpersuasive. An Upjohn competitor would reasonably interpret Ni's statements to mean that spray-dried lactose was an indispensable component of the claimed formulations. Upjohn's arguments fail to address or to explain away the first two sentences of paragraph 8 in which Ni clearly and unequivocally emphasized how critical spray-dried lactose is to the claimed formulations. As to the third sentence, even assuming that the terms "nonspray-dried lactose" and "hydrous lactose" are synonymous, this sentence would reasonably be interpreted, in light of the two declarations and notebook excerpts, to be yet another assertion of how important spray-dried lactose is to the claimed formulations, and an example of how Upjohn's micronized glyburide formulations with spray-dried lactose are superior to formulations without spray-dried lactose.

Further support for this conclusion comes from the Board itself. In its opinion reversing the examiner and allowing the claims, the Board characterized Upjohn's argument as follows:

[A]ppellant argues that using spray-dried lactose instead of nonspray-dried lactose in this manner results in a product which is more easily manufactured due to the free flowing characteristics of the composition to be formed into a unit dose. Appellant relies upon his two declarations filed under 37 CFR § 1.132 in support of this assertion.

Paper No. 21 at 2. The Board, relying on Upjohn's representations in reversing the examiner, apparently interpreted them as we do, and as the district court did, and premised its reversal of the examiner on that interpretation: that spray-dried lactose was crucial to the claimed micronized glyburide formulations and that Upjohn had relin-

quished rights to micronized glyburide formulations with nonspray-dried lactose.[3] Accordingly, we conclude that the district court properly held that Upjohn cannot succeed in its claim that Mylan's micronized glyburide formulations containing anhydrous lactose infringe the patent under the doctrine of equivalents.

## C. Collateral Estoppel

■ Upjohn argues that the district court erred in two respects in holding that Upjohn was estopped from asserting its infringement claims against Mylan based on the judgment of invalidity and unenforceability in *Mova*. First, Upjohn asserts that the jury in *Mova* failed to grasp the technical subject matter and issues, and that under *Blonder–Tongue,* the *Mova* judgment should be accorded no collateral estoppel effect because Upjohn did not have a full and fair opportunity to litigate. Second, Upjohn asserts that the collateral estoppel effect of the *Mova* judgment is "uncertain" and should not have been applied against Upjohn. In its appeal brief, Upjohn contends that the district court should have stayed the proceedings pending the resolution in *Mova* of its JMOL/new trial motion and possible appeal. Following the denial of its JMOL/new trial motion, which occurred after Upjohn filed its appeal brief in the present case, Upjohn additionally urges us in its reply brief to consolidate this appeal with its appeal in *Mova*, which is currently pending. Mylan responds that Upjohn did indeed have a full and fair opportunity to litigate and merely disagrees with the result in *Mova*. Mylan argues that the jury did understand the technology at issue and that the *Mova* court's "Opinion and Order" provides ample reasons to support the jury's verdicts of invalidity and unenforceability. While not responding to Upjohn's arguments that the application of collateral estoppel was premature based on the "uncertainty" of the *Mova* judgment, Mylan argues strenuously against consolidating this appeal with the *Mova* appeal. Mylan indicates that should we later reverse all or part of the *Mova* judgment,

those portions of the judgment will no longer have collateral estoppel effect and the district court's judgment here could be modified accordingly.

■ We find neither of Upjohn's arguments persuasive and conclude that the district court did not err in applying collateral estoppel. Collateral estoppel, also known as issue preclusion, shields a defendant from having to litigate issues that have been fully and fairly tried in a previous action and decided adversely to a party. *See Comair Rotron, Inc. v. Nippon Densan Corp.,* 49 F.3d 1535, 1537, 33 USPQ2d 1929, 1930 (Fed. Cir.1995). In the patent infringement context, the legal standard for determining whether a patentee is collaterally estopped from asserting its alleged patent right was established by the Supreme Court in *Blonder–Tongue. See Stevenson v. Sears, Roebuck & Co.,* 713 F.2d 705, 709, 218 USPQ 969, 972 (Fed.Cir.1983). The Supreme Court held that "once the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under the principles of collateral estoppel." *Mendenhall v. Barber–Greene Co.,* 26 F.3d 1573, 1577, 31 USPQ2d 1001, 1003 (Fed.Cir.1994) (summarizing the Supreme Court's holding in *Blonder–Tongue* ). An unrelated accused infringer may likewise take advantage of an unenforceability decision under the collateral estoppel doctrine. *See General Electro Music Corp. v. Samick Music Corp.,* 19 F.3d 1405, 1413, 30 USPQ2d 1149, 1155–56 (Fed. Cir.1994) ("The principle of *Blonder–Tongue* . . . respecting collateral estoppel also applies to unenforceability.").

The Court qualified its holding by stating that a judgment of invalidity will have no collateral estoppel effect if the patentee can show that it did not have a full and fair opportunity to litigate. *See Blonder–Tongue,* 402 U.S. at 332–34, 91 S.Ct. 1434, 169 USPQ at 521. *Blonder–Tongue* provides a list of

---

**3.** Moreover, we observe that Upjohn unequivocally disclosed in the written description of the patent that spray-dried lactose is crucial to the success of the micronized glyburide formulations. *See* '163 patent, col. 2, ll. 26–29 ("Critical to the success of the present composition is the employment of spray-dried lactose as the preponderant component by weight of the resulting composition.").

some, but not all, of the factors which may be considered in determining whether a patentee has had a full and fair opportunity to litigate the relevant issue or issues in a prior case:

> [I]f the issue is non-obviousness, appropriate inquiries would be whether the first validity determination purported to employ the standards announced in *Graham v. John Deere Co.* ...; *whether the opinions filed by the District Court and the reviewing court, if any, indicate that the prior case was one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit;* and whether without fault of his own the patentee was deprived of crucial evidence or witnesses in the first litigation.

*Id.* at 333, 91 S.Ct. 1434, 169 USPQ at 521 (emphasis added) (footnote omitted). Citing the emphasized language, Upjohn argues that it did not have a full and fair opportunity to litigate because the only way the jury could have reached its verdicts of invalidity and unenforceability was if the jury simply failed to grasp the subject matter. In making this argument, Upjohn implicitly urges us to perform a wholesale review of the *Mova* jury's verdicts.

■ We find Upjohn's argument to be without merit. As an initial matter, our role is limited to reviewing the district court's application of collateral estoppel, not the correctness of the jury verdicts in *Mova*. Under *Blonder–Tongue*, a district court's inquiry into whether the plaintiff was afforded a full and fair opportunity to litigate is quite narrow and does not involve a judgment on the merits:

> [I]t is clear from the case law that has developed since *Blonder–Tongue* that an inappropriate inquiry is whether the prior finding of invalidity was correct; instead, the court is only to decide whether the patentee had a full and fair opportunity to litigate the validity of his patent in the prior unsuccessful suit.

*Stevenson,* 713 F.2d at 709, 218 USPQ at 973; see also *Mississippi Chem. Corp. v. Swift Agric. Chem. Corp.,* 717 F.2d 1374, 1379, 219 USPQ 577, 581 (Fed.Cir.1983). The compre-

hensive Opinion and Order issued by the *Mova* court leaves no question that, as a matter of law, Upjohn was in fact accorded a full and fair opportunity to litigate.

In denying Upjohn's JMOL/new trial motion, the *Mova* court rendered a careful, methodical analysis supporting the jury's verdicts of invalidity and unenforceability. See *Mova,* 31 F.Supp.2d 211, 48 USPQ2d at 1360–62. The court performed a *Graham*-type obviousness analysis, see *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966), and applied the law of inequitable conduct, see *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 9 USPQ2d 1384 (Fed. Cir.1988). See Mova, 31 F.Supp.2d 211, 48 USPQ2d at 1361–62. *Blonder–Tongue* indicates that proper articulation of the law by the court is a factor supporting a conclusion that the patentee had a full and fair opportunity to litigate, see *Blonder–Tongue,* 402 U.S. at 333, 91 S.Ct. 1434, 169 USPQ at 521, and the *Mova* court cited the proper law. See *Mova,* 31 F.Supp.2d 211, 48 USPQ2d at 1360–62. Moreover, the *Mova* court's analysis in support of the jury verdicts persuades us that this is clearly not a situation in which the court or the jury "wholly failed to grasp the technical subject matter and issues in suit." *Blonder–Tongue,* 402 U.S. at 333, 169 USPQ at 521. The *Mova* trial lasted for nearly a month, see *Mova,* 31 F.Supp.2d 211, 48 USPQ2d at 1358, which suggests that Upjohn had ample time to explain its relatively straightforward pharmaceutical technology to the jury. Upjohn has provided no basis for us to conclude that the jury failed to comprehend the complexities of the case, other than that the jury held against it. Losing one's case is not evidence that the jury failed to understand the invention. Accordingly, we hold that Upjohn had a full and fair opportunity to litigate.

Upjohn next argues that the district court should have stayed the proceedings pending the resolution of its motion in *Mova* for JMOL/new trial and its possible appeal. Further, now that Upjohn's appeal in *Mova* is currently pending in this court, Upjohn contends that we should consolidate this appeal with the one in *Mova*. In these argu-

ments, Upjohn in effect disputes the finality of the *Mova* judgment, an essential component of its applicability for collateral estoppel purposes.

We disagree with Upjohn's arguments. The vast weight of case law supports according the *Mova* judgment full collateral estoppel effect.[4] Although the Fourth Circuit has not directly spoken on the issue, a district court opinion from that circuit, affirmed without opinion, suggests that the Fourth Circuit follows "[t]he established rule in the federal courts ... that a final judgment retains all of its res judicata consequences pending decision of the appeal ... [.]" *Warwick Corp. v. Maryland Dep't of Transp.*, 573 F.Supp. 1011, 1014 (D.Md.1983) (quoting 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4433, at 308 (1981)), *aff'd without opinion*, 735 F.2d 1359 (4th Cir.1984). This conclusion is buttressed by the uniformity of the rule in other circuits. In *SSIH Equipment S.A. v. United States International Trade Commission* we stated:

> [T]he law is well settled that the pendency of an appeal has no effect on the finality or binding effect of a trial court's holding. *Deposit Bank v. Board of Councilmen of City of Frankfort*, 191 U.S. 499, 24 S.Ct. 154, 48 L.Ed. 276 (1903). That rule is applicable to holdings of patent invalidity as well. *Alamance Industries, Inc. v. Gold Medal Hosiery Co.*, 194 F.Supp. 538, 540, 129 USPQ 219, 220 (S.D.N.Y.1961).

*SSIH Equipment S.A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 370, 218 USPQ 678, 683 (Fed.Cir.1983) (additional citations omitted); *see also* Wright et al., § 4433, at 308 (1981 & Supp.1998) (citing case law from the Supreme Court and from the Second, Fifth, Sixth, Seventh, Ninth, Eleventh, District of Columbia and Federal circuits for the proposition that a final judgment retains its preclusive effect despite the pendency of an appeal). Thus, the court below properly applied collateral estoppel despite the then *possibility* of an appeal in *Mova. See Williams*

*v. Commissioner*, 1 F.3d 502, 504 (7th Cir. 1993) ("[A] judgment final in the trial court may have collateral estoppel effect even though the loser has not exhausted his appellate remedies.").

Moreover, the district court did not err in according the *Mova* judgment collateral estoppel effect despite the pendency of Upjohn's JMOL/new trial motion in *Mova*. While the Fourth Circuit has not addressed this issue, the authorities and modicum of case law that have done so are nearly uniform in concluding that the fact that post-trial motions are pending does not affect the finality of a judgment and thus does not prevent its preclusive effect. *See Hubbell v. United States*, 171 U.S. 203, 210, 18 S.Ct. 828, 43 L.Ed. 136 (1898) (stating, albeit in dictum, that "[i]ndeed, it may well be doubted whether the pendency of a motion for a new trial would interfere in any way with the operation of the judgment as an estoppel."); *Tripati v. Henman*, 857 F.2d 1366, 1367 (9th Cir.1988) ("A pending Rule 59(e) motion similarly does not deprive a judgment of finality for res judicata purposes."); Restatement (Second) of Judgments § 13 cmt. f (1982) ("A judgment otherwise final for purposes of the law of res judicata is not deprived of such finality by the fact that time still permits commencement of proceedings in the trial court to set aside the judgment and grant a new trial or the like; nor does the fact that a party has made such a motion render the judgment nonfinal...."); 18 James Wm. Moore, *Moore's Federal Practice* § 131.30[2][c][iv], at 131–100 (3d ed. 1998) ("There seems to be no compelling argument for treating such [post-trial] motions or possible [post-trial] motions any differently than appeals. Finality should attach for claim preclusion purposes at the time of entry of judgment."). While it may be preferable in a particular case for a district court to allow some time to pass to allow for the resolution of post-trial motions before according a judgment collateral estoppel effect, *see* Wright et

---

4. Application of *Blonder–Tongue*, being an issue of patent law, is a matter within our exclusive jurisdiction and is hence subject to this court's law. However, because the application of general collateral estoppel principles, such as finality of judgment, is not a matter within the exclusive

jurisdiction of this court, we must apply the law of the circuit in which the district court here sits, *i.e.*, the Fourth Circuit. *See Hartley v. Mentor Corp.*, 869 F.2d 1469, 1471 n. 1, 10 USPQ2d 1138, 1139 n. 1 (Fed.Cir.1989).

al., § 4432, at 302 ("In most circumstances . . . it would be far wiser to avoid the matter by postponing the later proceedings for the relatively brief period typically required to await disposition of a new trial motion."); Restatement (Second), § 13 cmt. f, a district court need not do so.[5] We believe that, if faced with the issue before us, the Fourth Circuit would rule in accordance with the authority set forth above.

As indicated by the district court, the *Mova* judgment was entered on December 2, 1997. *See Mylan*, 5 F.Supp.2d at 406, 46 USPQ2d at 1837. The district court issued its order according collateral estoppel effect to the *Mova* judgment on March 31, 1998, nearly four months later. In view of the fact that Mylan's Abbreviated New Drug Application was being delayed due to its litigation with Upjohn, we do not believe that the district judge erred in effecting a prompt disposition of the case. Indeed, had the district court waited for the *Mova* court to rule on Upjohn's motion for JMOL/new trial before according the *Mova* judgment collateral estoppel effect, the court would have had to wait nearly nine months, imposing an undesirable delay in the resolution of the case before the court. *See Mova*, 31 F.Supp.2d 211, 48 USPQ2d at 1357 (noting that the amended ruling on Upjohn's JMOL/new trial motion in *Mova* was made on August 25, 1998).

We accordingly conclude that the district court did not err in applying collateral estoppel based on the judgment of invalidity and unenforceability in *Mova*, despite the fact that the motion for JMOL/new trial had not yet been resolved by the *Mova* court, and despite the possibility of a subsequent appeal of the *Mova* judgment. We also decline Upjohn's invitation to consolidate this appeal with the appeal in *Mova*. If another panel later concludes that one or more of the jury verdicts in *Mova* should be reversed, Upjohn may then move the district court to modify its judgment accordingly.

## CONCLUSION

The district court properly granted summary judgment that Mylan does not infringe the '163 patent under the doctrine of equivalents based on prosecution history estoppel. The district court also properly granted summary judgment on the alternative ground of collateral estoppel based on the judgment of invalidity and unenforceability in *Mova*. We therefore

*AFFIRM*.[6]

---

5. We note that these cases are relatively rare, because, as Moore observes, post-trial motions are typically ruled upon shortly after judgment is entered. *See* Moore, § 131.30[3][a], at 131–100 ("Post-trial motions are usually made and disposed of in a comparatively narrow time frame, so the issue of what impact a possible or pending motion has on the preclusive effect of the judgment is seldom addressed." (footnote omitted). Here, the *Mova* court ruled on Upjohn's JMOL/new trial motion nearly *nine months* after judgment was entered.

6. The language of the district court's collateral estoppel holding was as follows: "As to the issue of invalidity, the Court concludes that the *Mova* verdict makes the '163 patent unenforceable." *Mylan*, 5 F.Supp.2d at 407, 46 USPQ2d at 1838. The court ordered that "judgment in favor of the

defendant Mylan for non-infringement and *invalidity* of plaintiff Upjohn's U.S. patent 4,916,163 is **GRANTED**." Joint App. at 19 (underlining added). The district court's discussion preceding this holding, see *Mylan*, 5 F.Supp.2d at 406–07, 46 USPQ2d at 1837–38, however, clearly indicates to us that the district court was only holding that Upjohn was collaterally estopped from asserting its infringement claims based on the judgment of invalidity and unenforceability in *Mova*, not that the patent was unenforceable or invalid. Thus, its order should have stated that "judgment in favor of the defendant Mylan that it does not infringe the claims of U.S. Patent 4,916,163 under the doctrine of equivalents and that Upjohn is *collaterally estopped* from asserting its infringement claims based on the judgment of invalidity and unenforceability in *Mova*, is **GRANTED**."